United States Bankruptcy Court
Southern District of Texas

**ENTERED**

November 12, 2025

Nathan Ochsner, Clerk

### IN THE UNITED STATED BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 24-90566 |
| WELLPATH SF HOLDCO, LLC, | § | |
| Debtors. | § | Jointly Administered |
| | § | CHAPTER 11 |

### MEMORANDUM OPINION GRANTING H.I.G. CAPITAL LLC'S MOTION TO ENFORCE CONFIRMATION AND RELEASE ORDERS (RELATES TO ECF NO. 66)

## BACKGROUND

### I.   THE RELEASE ORDERS.

On November 11, 2025, Wellpath SF HoldCo, LLC, (hereinafter "Wellpath" or the "Debtor") and its affiliates (collectively, the "Debtors") filed a voluntary petition for Chapter 11 Bankruptcy.

Putative Creditors Estate of Carl Martin, Belynn Guerrero, Terry Martin, and Estate of Archuleta, Shelly Romero, and Stuart Patrick McLaney (collectively the "Colorado Plaintiffs") each have pending lawsuits against both Wellpath and H.I.G. Capital, LLC (hereinafter "HIG"), Wellpath's parent company, in the United States District Court for the District of Colorado (hereinafter the "Colorado District Court"). Putative Creditor Russell Fincham, IV (hereinafter "Mr. Fincham") has a pending lawsuit against both Wellpath and HIG in the United States District Court for the Western District of North Carolina (hereinafter the "North Carolina District Court").

The Colorado Plaintiffs' lawsuits are based on allegations that various Debtor and non-debtor entities, including HIG, engaged in conduct at the Adams County Detention Facility (hereinafter "ACDF") and El Paso County Criminal Justice Center (hereinafter the "CJC") (collectively the "Colorado Detention Facilities") that lead to the deaths and/or injuries of the three individuals at issue in the Colorado

Plaintiffs' cases in violation of the U.S. Constitution and Colorado state law. Mr. Fincham's lawsuit is based on analogous allegations that HIG, among others, engaged in conduct at the Mecklenburg County Detention Facility (hereinafter the "North Carolina Detention Facility") that lead to the death of Mr. Fincham in violation of U.S. Constitution. All conduct in the Colorado Plaintiffs' lawsuits and Mr. Fincham's lawsuit is alleged to have occurred prior to the Debtors' petition date.

On November 13, 2024, the Debtor filed its Notice of Bankruptcy in the Colorado District Court, thereby staying each of the Colorado Plaintiffs' actions during the pendency of the Debtors' bankruptcy proceedings. On November 15, 2024, the Debtor filed its Notice of Bankruptcy in the North Carolina District Court, staying Mr. Fincham's action.[1]

On May 1, 2025, the Court entered the Order (I) Authorizing and Approving the Settlement Agreement with H.I.G. Capital, LLC Under Bankruptcy Rule 9019, and (II) Granting Related Relief (hereinafter the "HIG Settlement Order").[2] Under the HIG Settlement Order, in exchange for, *inter alia*, a $3,000,000 cash payment and additional value of as much as $22,050,000, the Debtors' Estates, including the Estate of Wellpath, released HIG and its affiliates of any and all claims (with the exception of carved out directors' and officers' liability claims) they might assert against HIG.[3]

Also on May 1, 2025, the Court entered the Findings of Fact, Conclusions of Law, and Order (I) Confirming the First Amended Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of Its Debtor Affiliates and (II) Approving the Disclosure Statement on a Final Basis (hereinafter the "Plan Confirmation").[4] Under the Plan Confirmation, the Debtors fully released all indirect,

---

[1] ECF No. 67-5, Ex. E-1 at 11.
[2] Case No. 24-90533, ECF No. 2591.
[3] *Id.* at 8.; Case No. 24-90533, ECF No. 2157 at 8.
[4] Case No. 24-90533, ECF No. 2596.

derivative claims against certain released parties, including against HIG and its affiliates.[5]

## II. THE COLORADO PLAINTIFFS' AMENDED COMPLAINTS AND THE FINCHAM COMPLAINT.

After the Court entered the Plan Confirmation and the stay was lifted, each of the Colorado Plaintiffs sought to proceed against non-debtor defendants, including HIG, in their respective District Court cases.[6] After conferral with counsel for HIG, the Colorado Plaintiffs filed amended complaints (hereinafter the "Colorado Amended Complaints"), removing any claims based on indirect liability, agreeing that such claims were property of the Debtors' Estate and were therefore released under the HIG Settlement Order and Plan Confirmation (collectively the "Release Orders").[7] The factual record does not indicate that Mr. Fincham filed an amendment to his complaint post-confirmation in light of the Release Orders. Therefore, the Court will only consider the first amended complaint Mr. Fincham filed prepetition which originally added causes of action against HIG (hereinafter the "Fincham Complaint").[8]

Each of the Colorado Amended Complaints plead causes of action against HIG for deliberately indifferent medical and mental health care and treatment in violation of 42 U.S.C. § 1983, negligence, and negligent supervision and training causing wrongful death, in violation of Colorado state law.[9] The Colorado Plaintiffs currently characterize these causes of action as direct liability claims against HIG, based on

---

[5] *Id.*, Ex. A at 24–25, 73–76.

[6] ECF No. 318 at 4.

[7] *Id.* The Court finds the Colorado Amended Complaints—rather than the original complaints—are the relevant pleadings for consideration with respect to the captioned motion. *See id.* at 5, n. 4. The Court considers the *Declaration of Eyal Berger* insofar as the documents attached thereto provide the Court a copy of each of the Colorado Amended Complaints as well as the Fincham Complaint. *See* ECF No. 67-2, 67-3, 67-4, 67-5. Accordingly, the Court takes judicial notice of the pertinent pleadings in the Colorado Plaintiffs' actions and Mr. Fincham's action.

[8] ECF No. 67-5, Ex. E-2.

[9] ECF No. 67-2, Ex. B-3 at 96, 102; ECF No. 67-3, Ex. C-3 at 85, 89–90; ECF No. 67-4, Ex. D-3 at 50, 56, 57.

HIG's alleged involvement in cost-cutting measures at Wellpath which ultimately harmed inmates at the Colorado Detention Facilities.[10]

Mr. Fincham similarly plead multiple causes of action against HIG arising out of deliberate indifference to serious medical health needs in violation of 42 U.S.C. § 1983, and various other violations of the Fourteenth Amendment to the U.S. Constitution.[11]   Mr. Fincham, however, does not now argue his claims against HIG are based on direct liability.   Rather, in distinction to the Colorado Plaintiffs' Amended Complaints, the Fincham Complaint expressly bases its cause of action against HIG on a theory of indirect liability, alleging that "Wellpath is a mere agent or instrumentality of HIG," and that "HIG is the alter ego of Wellpath, and/or alternatively Wellpath acts on behalf of HIG, who has control over [Wellpath]."[12]

The Colorado Amended Complaints each base their causes of action on virtually the same factual allegations regarding HIG's involvement with Wellpath.   They assert HIG, "through its investment fund call[ed] the 'Advantage Fund,' which is directed and controlled by HIG employees acting in the interest of HIG," was "responsible for the management, hiring, retaining, training, and supervision of Wellpath executives and employees and Wellpath's contracts, policies, and practices, customs, and finances in the service of providing medical care to inmates, including inmates such as [the Colorado Plaintiffs] at [their respective Detention Facilities]," and that "Wellpath and its executives, directors, supervisors, and medical providers act on behalf of HIG capital."[13]

The Amended Complaints state that HIG "exercise[d] sufficient control over [] Wellpath's activities at the [Detention Facilities] such that [] Wellpath was a mere agent of [] HIG at the [Detention

---

[10] ECF No. 318 at 6.

[11] ECF No. 67-5, Ex. E-2 at 75, 80.

[12] *Id.* at 22.

[13] ECF No. 67-2, Ex. B-3 at 7; ECF No. 67-3, Ex. C-3 at 7; ECF No. 67-4, Ex. D-3 at 5–6.

Facilities]."[14]  In support of its control argument, the Colorado Amended Complaints allege HIG placed various of its employees, including Michael Kuritzsky, Justin Reyna, and Rob Wolfson, on the "boards or managing bodies of [] Wellpath in order to maintain a high degree of day-to-day control over [] Wellpath's activities."[15]  Mr. Kuritzsky, Mr. Reyna, and Mr. Wolfson also allegedly act in a managerial capacity for HIG's Advantage Fund, which owns Wellpath as a portfolio company.[16] According to the Complaints, the Advantage Fund "exercises total control over its portfolio companies as part of its 'proactive investment philosophy' including the ability to 'make any necessary changes to its portfolio companies.'"[17]  According to the Colorado Amended Complaints, this dual-ownership structure resulted in Mr. Kuritzsky, Mr. Reyna, and Mr. Wolfson "directly control[ing] Wellpath."[18]  Through this day-to-day control HIG and its employees on the Advantage Fund had over Wellpath, the Colorado Amended Complaints allege HIG pursued its "clear goal of cutting costs at the expense of quality of care."[19]

The Colorado Amended Complaints allege "Wellpath undertook the provision of jail medical and mental health services with the understanding that [HIG] was the principal in control of those activities" and that HIG "authorized and in fact required [Wellpath] to conduct those activities in a manner that prioritized containment of costs and jeopardized the lives of individuals with serious medical conditions."[20]

---

[14] ECF No. 67-2, Ex. B-3 at 8; ECF No. 67-3, Ex. C-3 at 58; ECF No. 67-4, Ex. D-3 at 28.  According to the Martin Amended Complaint, the "control exercised by HIG over Wellpath went far beyond the ordinary control an investor might exercise over a portfolio company."  ECF No. 67-2, Ex. B-3 at 8.

[15] ECF No. 67-2, Ex. B-3 at 8–9; ECF No. 67-3, Ex. C-3 at 58; ECF No. 67-4, Ex. D-3 at 28.

[16] ECF No. 67-2, Ex. B-3 at 9; ECF No. 67-3, Ex. C-3 at 58–59; ECF No. 67-4, Ex. D-3 at 28–29.

[17] *See supra* note 16.

[18] *See supra* note 16.

[19] ECF No. 67-2, Ex. B-3 at 10; ECF No. 67-3, Ex. C-3 at 60; ECF No. 67-4, Ex. D-3 at 30.

[20] *See supra* note 19.

The Colorado Amended Complaints allege that "by requiring [Wellpath] to cut costs at the expense of necessary life-saving medical care, [HIG] directly controlled and caused the conditions that led to [the Colorado Plaintiffs' deaths] at [each of the respective Detention Facilities]."[21] Moreover, HIG "ratified the conduct of Wellpath by knowingly accepting the risks of jail medical services and mental health services despite knowledge of past and current unconstitutional actions and inactions of its agent Wellpath…causing harm to sick and mentally ill inmates and detainees."[22]

The Amended Complaints also allege

treating [] [HIG] as a disinterested corporate entity that is not responsible for the acts of [Wellpath] at the [Colorado Detention Facilities], who are under its ownership and control, would promote injustice and defeat the rights and equities of [the Colorado Plaintiffs]; it would enable and facilitate continued [] unconstitutional conduct, practices, customs and policies, actions and inactions that harm particularly vulnerable jail populations and discourage abatement of these unconstitutional actions and inactions.[23]

The factual allegations in the Fincham Complaint are distinct only insofar as there is no reference to HIG employees sitting on the Advantage Fund, no allegation that HIG's control over Wellpath went beyond the ordinary control of an investor over a portfolio company, and no allegation that HIG directly controlled and caused the conditions that lead to Mr. Fincham's death.[24] Otherwise, the factual allegations in the Fincham Complaint regarding HIG's oversight over Wellpath are

---

[21] ECF No. 67-2, Ex. B-3 at 11; ECF No. 67-3, Ex. C-3 at 60; ECF No. 67-4, Ex. D-3 at 30.

[22] ECF No. 67-2, Ex. B-3 at 11.

[23] ECF No. 67-2, Ex. B-3 at 8; ECF No. 67-3, Ex. C-3 at 57; ECF No. 67-4, Ex. D-3 at 27.

[24] *See generally* ECF No. 67-5, Ex. E-2.

largely the same as those found in the Colorado Amended Complaints, verbatim.

## III.   THE MOTION TO ENFORCE.

On July 24, 2025, HIG filed the above captioned motion (hereinafter the "Motion to Enforce") seeking to enforce the settlement and release agreements contained in the Release Orders by enjoining the Colorado Plaintiffs and Mr. Fincham from continuing their lawsuits against HIG.[25]   At a high level HIG argues two points: (i) the claims of the Colorado Plaintiffs and Mr. Fincham as spelled out in their respective pleadings are indirect liability claims, and (ii) those claims are causes of action that were fully and conclusively released by the Debtors' Estates under the Release Orders.[26]

Regarding the indirect liability issue, HIG argues under *United States v. Bestfoods*, the Colorado Plaintiffs' claims are not direct claims against HIG because each of the Colorado Amended Complaints fail to "allege a single fact regarding HIG's conduct with respect to any Plaintiff, the Inmate, or even a Facility."[27]   Rather, HIG argues the allegations in the Colorado Amended Complaints sound in indirect liability because the claims revolve around HIG's alleged control over Wellpath, its subsidiary.   HIG argues the complaints originally sought to hold HIG indirectly or derivatively liable for the alleged conduct of Wellpath which affected the quality of treatment at the Colorado Detention Facilities.[28]   According to HIG, when the complaints were amended postconfirmation to bolster direct liability claims against HIG, the Colorado Plaintiffs merely struck the word "or instrumentality" from allegations that Wellpath was a "mere agent or instrumentality" of HIG, thereby proving that the claims were originally indirect liability and now are "new-in-name-only."[29]   HIG argues that the Colorado Amended

---

[25] ECF No. 66.

[26] *Id*. at 3, 27.

[27] *Id*. at 8; *United States v. Bestfoods*, 524 U.S. 51 (1998).

[28] ECF No. 66 at 12.

[29] *Id*. at 2.

Complaints generally rest HIG's purported direct liability on a "handful of additional" factual allegations that are virtually the same in each of the Colorado Plaintiffs' pleadings.[30]

Finally, HIG argues that none of the Colorado Amended Complaints allege HIG itself had a relationship with the Colorado Detention Facilities that would give rise to direct liability, nor that HIG acted through Wellpath "with respect to the discrete act or transaction" which caused harm to each Plaintiff at the Colorado Detention Facilities.[31]   Instead, HIG emphasizes the Colorado Amended Complaints continue to allege conduct on the part of Wellpath (not HIG) that resulted in allegedly inadequate medical care.[32]   Taken as a whole, it is HIG's position that these allegations could only ever give rise to indirect liability on the part of HIG.[33]

According to HIG, Mr. Fincham's causes of action are literally based on a theory of indirect liability and Mr. Fincham does not attempt to argue otherwise.[34]   Moreover, HIG highlights Mr. Fincham has merely plead that to the extent contractual relationships were entered into with relevant authorities that allegedly harmed Mr. Fincham, Wellpath entered into those relationships on its own authority and on behalf of itself and did so prior to HIG's acquisition of Wellpath.[35]

---

[30] *Id.* at 10.   The relevant factual allegations in the Colorado Amended Complaints are summarized in Background Section II.   HIG draws attention to six main allegations: "(1) HIG through its 'Advantage Fund' 'was the owner, manager, and partner of Wellpath' and thus 'had control over' Wellpath, (2) HIG acquired the entities that would become Wellpath, (3) HIG merged those entities into Wellpath for the 'purpose of carrying [HIG's] ownership and financial interests in providing jail mental and medical health,' (4) HIG 'placed its senior partners and/or members on the boards or managing bodies of Defendant Wellpath,' (5) the Advantage Fund had 'the ability to 'make any necessary changes to its portfolio companies,' and (6) HIG 'directs and controls the day-to-day activities of all its healthcare portfolio companies.'"   *Id.* at 10–11.

[31] *Id.* at 25.

[32] *Id.*

[33] *Id.* at 25–26.

[34] *Id.* at 17.

[35] *Id.*

Regarding the property of the estate issue, HIG argues that under *In re Emoral, Inc.*, claims of the Colorado Plaintiffs and Mr. Fincham are causes of action belonging to the Debtors' Estates because i) the Debtor could have asserted those claims on its own behalf at the commencement of the bankruptcy case, and ii) the claims are "general claims" available to all of the Debtors' creditors.[36] HIG argues prong one of the *Emoral* test is satisfied as both the Colorado Plaintiffs' claims and Mr. Fincham's claims existed at the commencement of the bankruptcy filing, and the Debtors were able to bring any veil-piercing or derivative liability claims that may have existed under state law.[37]

Regarding *Emoral* prong two, HIG first argues that claims based on indirect liability—such as the Colorado Plaintiffs' and Mr. Fincham's—typically constitute "general claims" available to all creditors.[38] Second, HIG argues the similar nature of the factual allegations and legal theories in the Colorado Plaintiffs' and Mr. Fincham's complaints demonstrate the generality—rather than the individuality—of each claim.[39] Accordingly, HIG argues those causes of action were general claims within the Debtors' Estates.[40]

Finally, as a means of expediting similar claims brought against HIG by other putative creditors on account of prepetition conduct, HIG requested that this Court enter an Order establishing a formal process for resolving disputes seeking to litigate released claims, granting HIG the authority to file motions before this Court and argue its basis for contending that such claims assert only indirect liability.[41]

On August 14, 2025, the Colorado Plaintiffs filed a Joint Response to HIG's Motion (hereinafter the "Response"), arguing against HIG's

---

[36] *Id.* at 27; *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014).
[37] ECF No. 66 at 28–29.
[38] *Id.* at 29.
[39] *Id.* at 30.
[40] *Id.* at 30.
[41] *Id.* at 31.

characterization of their Amended Complaints.[42]  Namely, the Colorado Plaintiffs argue the claims they originally brought in the Colorado District Court sounded in *both* direct and indirect liability against HIG for its alleged involvement in cost-cutting measures at Wellpath which negatively impacted the quality of medical care inmates received at the Colorado Detention Facilities.[43]  The Colorado Plaintiffs agree that any and all indirect liability claims against HIG were released under the Released Orders, but that their claims for deliberate indifference and negligence against HIG "are [] based, and have always been based, on HIG's direct liability" and therefore were not released.[44]  The Colorado Plaintiffs rest their theories of direct liability on allegations that HIG

> alongside Wellpath and [other] municipal Defendants, is 'liable for [its] deliberately indifferent policies, training, practices, habits, customs, widespread usages, and failures to adequately train and supervise [its] employees and contractors with respect to the serious medical needs of detainees like [the Plaintiffs]' which were moving forces in their injuries and violations of their constitutional rights to be free of deliberate indifference.[45]

The Colorado Plaintiffs also argue HIG is liable

> for its own 'negligence, negligent supervision, and negligent training of staff; for failing to ensure the provision of appropriate care in the treatment of [the Plaintiffs]; for the acts and omissions of agents and/or employees' and for [acts] by involved employees, agents, staff, and affiliates, who were acting within the scope and course of their employment.[46]

In support of its request to deny the Motion to Enforce, the Colorado Plaintiffs proffered evidence from their Colorado District Court

---

[42] ECF No. 318.  Mr. Fincham did not join the Colorado Plaintiffs' Response and has not filed his own objection to HIG's Motion to Enforce.

[43] *Id.* at 5–6.

[44] *Id.* at 6.

[45] *Id.*

[46] *Id.* at 6–7.

proceedings purportedly supporting a finding that HIG "through its []
employees, supplies a 'management team' that exerts 'day-to-day
management and operational control' of Wellpath to drive harmful and
dangerous cost-cutting measures at jails and prisons where Wellpath
operates, including [the Colorado Detention Facilities.]"[47] This evidence
includes a promotional document allegedly used as part of HIG's process
to select investment funds which characterizes HIG as "focusing on
driving profits through operational efficiencies and direct hands-on
control of its portfolio companies."[48] The Colorado Plaintiffs further
allege HIG advertised to a prospective investor group that when it uses
a particular fund to acquire a portfolio company, the "[f]und will
typically have the majority of the seats on the [b]oard of [d]irectors of
[that] company," and that "[HIG] believes [] this control is essential
given its proactive investment philosophy" and that "[this control] gives
[HIG] the ability to make any necessary changes to its portfolio
companies."[49] According to the Colorado Plaintiffs,

> [HIG's] 'operating philosophy is to form a close partnership with
> the management team of an [acquired] portfolio company and
> jointly develop the portfolio company's strategic direction, KPIs,
> priorities, and associated action plans…[HIG] is actively involved
> in the business decisions, which it believes are vital to generating
> significant incremental value…[HIG] requires portfolio
> companies to provide them with weekly and monthly operating
> and financial data customized to monitor the portfolio company's
> performance in real time.[50]

The Colorado Plaintiffs claim the relationships HIG advertises as
forming with its acquired portfolio companies—like Wellpath—and the
day-to-day control members of the Advantage Fund had over the
operations of Wellpath created "the type of agency relationship" giving

---

[47] *Id.* at 8–9.
[48] *Id.* at 8.
[49] *Id.*
[50] *Id.*

rise to the theory of direct liability the Colorado Plaintiffs now base their claims on.[51]

Regarding the property of the estate issue, the Colorado Plaintiffs argue that under *Emoral*, their claims fall outside of the Debtors' Estate and therefore were not released under the Release Orders.[52] The Colorado Plaintiffs concede prong one of the *Emoral* standard, as their claims existed at the commencement of the bankruptcy filing and Wellpath may have been able to bring those claims on its own behalf under state law.[53] To the extent, however, the Colorado Plaintiffs' claims are based on direct liability, they suggest the Debtor may not have been able to bring those claims on its own behalf under state law.[54]

The Colorado Plaintiffs argue *Emoral* prong two is not satisfied because (i) the facts giving rise to each of the Colorado Plaintiffs' claims are unique to each Plaintiff, and (ii) because their claims are direct liability claims, a successful recovery against HIG benefits only the Colorado Plaintiffs, rather than all creditors of Wellpath.[55] As described above, the Colorado Plaintiffs claim HIG's relationship and control over Wellpath and its implementation of medical treatment at the Detention Facilities gave rise to a legal duty on the part of HIG to inmates.[56] The Colorado Plaintiffs claim HIG's alleged breach of this duty made it directly liable for deliberate indifference and negligence.[57] Accordingly, they argue the causes of action are particularized and only the Colorado Plaintiffs have an interest in asserting them against HIG.[58]

The Colorado Plaintiffs maintain that because each Plaintiff in their respective suit has opted out of the Plan, they have not released any direct claims they may have against HIG, and therefore the Release

---

[51] *Id.*
[52] *Id.* at 10.
[53] *Id.*
[54] *Id.* at 10, 16.
[55] *Id.* at 11–12, 15–16.
[56] *Id.* at 6–7.
[57] *Id.* at 15–16.
[58] *Id.*

Orders do not preclude them from continuing to litigate their claims against HIG in the Colorado District Court.[59]

Finally, the Colorado Plaintiffs urge the Court to reject HIG's proposed formal claims process, characterizing the expedited schedule as gamesmanship, and an effort to evade legitimate claims against HIG without providing adequate time to address such claims on their merits.[60]

On August 21, 2025, HIG filed a Reply, reiterating its position that the claims of the Colorado Plaintiffs and Mr. Fincham are indirect liability claims, and those claims are property of the estate conclusively released under the Release Orders.[61]

## JURISDICTION

28 U.S.C. § 1334(a) provides the District Courts with jurisdiction over this proceeding. 28 U.S.C. § 157(b)(1) states that "Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." This proceeding has been referred to this Court under General Order 2012-6 (May 24, 2012). This Court has jurisdiction in this proceeding as it is a core proceeding which the Court can consider under 28 U.S.C. §§ 157(b)(2)(A) and (B). Under Fed. R. Bankr. P. 7001(g), the Court may enforce an injunction contained in a Chapter 11 plan on motion, without the need for an adversary proceeding. The Court has constitutional authority to enter final orders and judgments. *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011). And venue is proper under 28 U.S.C. §§ 1408 and 1409.

---

[59] *Id.* at 16.
[60] *Id.* at 17.
[61] ECF No. 363.

## DISCUSSION

Before the Court are two related issues. First, whether under *Bestfoods* the causes of action against HIG as plead in the Colorado Amended Complaints are based on theories of direct liability. Without need for parsing Mr. Fincham's complaint, the Court finds that his causes of action against HIG are expressly based on theories of indirect liability. Therefore, the Court need not apply *Bestfoods* to his complaint.

The second issue is whether the claims of the Colorado Plaintiffs and Mr. Fincham are property of the Debtors' Estates under *Emoral*.

The Court will address each issue in turn.

## I. THE COLORADO PLAINTIFFS' AND MR. FINCHAM'S CLAIMS AGAINST HIG ARE INDIRECT LIABILITY CLAIMS.

### A.

### (1) The *Bestfoods* Test for Parsing Direct and Indirect Liability Claims.

Under *Erie Railroad Co. v. Tompkins*, a District Court exercising supplemental jurisdiction over a state tort or derivative liability claim will apply the substantive law of the state in which the District Court sits. 304 U.S. 64 (1938). Under Colorado choice of law rules, derivative claims seeking to impose liability on a parent for the acts of a subsidiary are governed by the substantive law of the state in which the subsidiary is incorporated. *Jones v. Marquis Props., LLC*, 212 F.Supp.3d 1010, 1021 (D. Colo. 2016). Wellpath and HIG are both incorporated in Delaware. Therefore, Delaware law governs this dispute, and the Parties do not appear to dispute this. Delaware recognizes two distinct theories upon which to base a parent's liability for the actions of a subsidiary: (i) indirect liability, and (ii) direct liability. *Otto Candies, LLC v. KPMG, LLP*, No. 2018-0435-MTZ, 2020 WL 4917596, at *9 (Del. Ch. Aug. 21, 2020). In general, an indirect liability claim "focus[es] on setting aside the corporate form," while a direct liability claim "respects the corporate form" and imposes liability for "wrongdoing authorized by

[the parent], but conducted by [the subsidiary]." *Id.* at \*9. A direct liability claim premised on agency or control requires specific allegations "the [parent] had control over the wrongdoing at issue." *Id.* at \*8.

In *United States v. Bestfoods*, the United States Supreme Court laid out the test for differentiating claims based on direct versus indirect liability. 524 U.S. 51. In *Bestfoods*, the United States had brought actions under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) against five interrelated defendants comprised of parent and subsidiary corporations, seeking recovery of funds expended by the Environmental Protection Agency in cleaning up hazardous waste left by a chemical manufacturing plant operated by various corporate subsidiaries near Muskegon, Michigan. *Id.* at 55. In determining whether to hold the parent defendants directly liable under CERCLA for the wrongdoing of their subsidiaries, "the District Court applied the 'actual control' test for whether the parents 'actually operated the business of its subsidiar[ies].'" *Id.* at 67. The actual control test analyzes "the relationship between two corporations" which the Court noted is generally "an issue going to indirect liability." *Id.* at 68. The Court clarified that the appropriate test for *direct liability* should instead focus on "the parent's interaction with the subsidiary's *facility*." *Id.* (emphasis added). The Court articulated the proper standard

> is not whether the parent operates the subsidiary, but rather whether it operates *the facility*, and that operation is *evidenced by participation in the activities of the facility, not the subsidiary*. Control of the subsidiary, if extensive enough, gives rise to indirect liability under piercing doctrine, not direct liability under the statutory language.

*Id.* (emphasis added). Therefore, the appropriate inquiry for holding a parent directly liable requires focusing on the parent's relationship with the specific facility in question.

The Court went on to note that "directors of a parent corporation [serving] as directors of its subsidiary" alone "may not serve to expose the parent corporation to liability for its subsidiary's acts" and simply proving that "dual officers and directors made policy decisions and supervised activities at [a] facility" cannot be enough to establish direct liability. *Id.* at 69 (citing *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 57 (2d Cir. 1988)).[62]

Expounding on the appropriate inquiry for distinguishing a "parental officer's oversight of a subsidiary from [] control over the operation of the subsidiary's facility," the Court referenced to norms of corporate behavior:

> '[A]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability.' [citation omitted]. The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.

*Id.* at 72.

Accordingly, *Bestfoods* has made clear that dual ownership of a parent and subsidiary alone is not sufficient to hold a parent liable for decision-making and supervision activities at a facility.

---

[62] The Court explained the "time-honored common-law rule" that "directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership" and that in order to hold a parent directly liable under such circumstances, a claimant "would have to show that [] the officers and directors were acting in their capacities as [parent] officers and directors, and *not* as [subsidiary] officers and directors, when they" engaged in policy decision-making and supervision activities at a facility. *Id.* at 69–70.

> **(2)**   *In re Port Neches* and *In re First Reserve Management.*

The Colorado Plaintiffs argue this Court should follow the holding of *In re Port Neches Fuels, LLC*, where the United States District Court for the District of Delaware found plaintiffs' negligent undertaking claims against a parent corporation based on the parent's control of a subsidiary's operations at a facility were based on theories of direct liability. 660 B.R. 177, 193 (D. Del. 2024).

After an explosion at TPC Group's petrochemical plant in Port Neches, Texas, TPC Group filed for bankruptcy and ultimately confirmed a plan of reorganization that contained third-party releases for claims asserted or assertable on or behalf of the debtors, the reorganized debtors, or the estates against certain released parties, including the debtors' equity sponsors. *Id.* at 180. As part of its corporate ownership structure, TPC Group, a subsidiary company, was owned by a Sawgrass Holdings GP, LLC (hereinafter "Sawgrass") which in turn was owned by two separate equity sponsors—First Reserve Management, LP (hereinafter "First Reserve") and SK Capital Partners, LP. *See In re First Reserve Mgmt., L.P.*, 671 S.W.3d 653, 657 (Tex. 2023). The equity sponsors had certain of their employees sit on the board of Sawgrass and allegedly maintained day-to-day operational control over the TPC Group petrochemical processing plant. *Id.*

Plaintiffs originally brought claims for personal injury and property damage against TPC Group and the equity sponsors in a multidistrict litigation proceeding (hereinafter the "MDL plaintiffs") in Texas state court. *In re Port Neches*, 660 B.R. at 181. These claims were based on theories of corporate veil piercing and negligent undertaking. *Id.* The equity sponsors moved to enforce the plan in the Delaware Bankruptcy Court proceeding, arguing the MDL plaintiffs' claims were *inter alia* based on theories of indirect liability, and that because such claims were property of the debtors' estates those claims were released under the plan. *In re TPC Grp., Inc.*, No. 22-10493 (CTG), 2023 WL 2168045, at *1–2 (Bankr. D. Del. Feb. 22, 2023). The Delaware

Bankruptcy Court granted in part and denied in part the motion to enforce. *Id.* at *11. The court found the MDL plaintiffs' corporate veil piercing claims were based on indirect liability claims and were therefore property of the debtors' estates released under plan. *Id.* at *5. Conversely, the court found the MDL plaintiffs' negligent undertaking claims were direct liability claims, were not property of the estate, and were therefore not released under the plan. *Id.* at *8.

Soon after the Delaware Bankruptcy Court issued its ruling, the Texas Supreme Court ruled on a writ of mandamus filed by First Reserve in the Texas state court MDL proceeding, after the trial court denied the equity sponsor's motion to dismiss. *In re First Reserve Mgmt.*, 671 S.W.3d at 657–58.[63]

There the MDL plaintiffs reiterated their position that they asserted direct liability negligent undertaking claims against the equity sponsors. *Id.* at 660. The MDL plaintiffs argued First Reserve undertook to take charge of TPC Group's day-to-day operations by exercising control at the petrochemical plant through appointees to the board of Sawgrass, and that because First Reserve was negligent in failing to make plant operations safe, the equity sponsor should be held directly liable for harms the MDL plaintiffs suffered. *Id.*

The Texas Supreme Court rejected this argument. First, the court analyzed the corporate structure of the companies, noting that "[direct] liability cannot be based on First Reserve's ownership interest in TPC, its appointments to the [Sawgrass] board, or any other action that is consistent with its investor status." *Id.* at 661; (citing *Bestfoods*, 524 U.S. at 72).

---

[63] As a preliminary matter, the Texas Supreme Court acknowledged the Delaware Bankruptcy Court's opinion in *In re TPC Group*, recognizing that the court there had already determined that the MDL plaintiffs' veil piercing claims were indirect liability claims, were property of the debtors' estate, and were released under the plan. *Id.* at 658. The negligent undertaking claims, however, were determined to "'not [be] affected' by the plan or the injunction," leaving them ripe for mandamus review on First Reserve's motion to dismiss under TEX. R. CIV. P. 91(a)(1). *Id.* at 659.

Second, the court looked to whether the MDL plaintiffs "plead facts showing that First Reserve undertook in other ways to run TPC's day-to-day operations and, specifically, to delay the turnaround that could have prevented the explosions." *Id.* at 662.  The court operated off the premise that an "undertaking duty cannot be predicated on…a parent's supervision of its subsidiary's financial and budgetary decisions." *Id.* at 663 (citing *Bestfoods*, 524 U.S. at 72).  Regardless, the court found that "First Reserve had no authority itself over TPC's budget and expenses" and that "[t]hat authority was vested solely in the [Sawgrass] board, not in First Reserve." *Id.*

The court next analyzed the MDL plaintiffs' allegations that the equity sponsors, including First Reserve

> acted with direct operational control over safety with respect to the safeguards, protocols, procedures, personnel, equipment, inspections, and resources and control such that [the equity sponsors] took control away from TPC and supplanted TPC's duties to its employees and the public with respect to the specific safety decisions that led to the explosion and the harms that followed.

*Id.* at 663.  The court found that rather than pleading "a single instance where First Reserve *itself*" engaged in such operational control, the MDL plaintiffs consistently plead that "First Reserve 'and Sawgrass'" did those things. *Id.* at 662–63 (original emphasis).  Moreover, the court found the complaints failed to allege "*how* First Reserve *itself* took and exercised such control [over TPC] other than through its ownership interest" and the Sawgrass board. *Id.* (emphasis added).  The court therefore concluded the MDL plaintiffs did not plead facts showing that First Reserve undertook to control TPC Group's day-to-day operations as to give rise to a direct liability claim against First Reserve. *Id.* at 663.

Accordingly, the court held the MDL plaintiffs' claims were enjoined by the release agreements in the plan.[64]

Later, in *In re Port Neches*, the Delaware District Court affirmed the Delaware Bankruptcy Court's holding that the very same MDL plaintiffs' claims the Texas Supreme Court found were indirect liability claims released under the plan were actually direct liability claims not released under the plan.  660 B.R. at 193.[65]

After the Delaware District Court entered its Order, the Texas Court of Appeals issued a writ of mandamus, further reviewing the MDL court's denial of First Reserve's motion to dismiss in light of the Texas Supreme Court's ruling in *In re First Reserve Management*.  *In re First Reserve Mgmt., L.P.*, No. 09-24-00203-CV, 2025 WL 480807, at *1 (Tex. App. Feb. 13, 2025).  Consistent with the Texas Supreme Court's ruling, the Texas Court of Appeals concluded that the MDL plaintiffs had failed to allege any direct liability claims against either Sawgrass or the equity sponsors.[66]

---

[64] *Id.*  Ultimately, however, the court denied First Reserve's petition for writ of mandamus, as directing the MDL court to take action based on the rulings in the opinion might have a disruptive effect on proceedings that had been stayed in TPC's bankruptcy proceeding.  *Id.* at 663–64.

[65] The Delaware District Court determined the MDL plaintiffs' negligent undertaking theories were "for harms done to them directly by the [equity sponsors]." *Id.*  The court further held that claims the equity sponsors "misus[ed] the Port Neches plan by 'demanding TPC increase production all the while crucially denying funds to adequately supply the plant with spare parts…or perform necessary maintenance needed to keep the plant safe' [were] not 'common claims against…non-debtors who have misused the debtor's property in some fashion.'"  *Id.* (citing *In re Emoral*, 740 F.3d 879).

[66] First, the Texas Court of Appeals rejected the MDL plaintiffs' argument that the alleged "direct, extraordinary operational control" of the equity sponsors over TPC gave rise to a direct liability negligent undertaking claim, because as the Texas Supreme Court previously stated, "an undertaking duty cannot be predicated on…a parent's supervision of its subsidiary's financial and budgetary decisions."  *Id.* at *6. Second, the Texas Court of Appeals rejected the MDL plaintiffs' argument that Sawgrass's "high degree of operational control and direction, usurp[ation of] safety functions, financial interest, and ownership" over TPC made the holding company directly liable for negligent undertaking.  *Id.* at *8.  Applying the same standard laid

**B.**

First, this Court must determine the applicability of the holding in *In re Port Neches* to determine whether a cause of action against a parent for its operation of a facility through a subsidiary gives rise to direct liability.  Second, the Court must determine whether the claims of the Colorado Plaintiffs and Mr. Fincham against HIG are based on theories of direct liability through application of the *Bestfoods* standard.

**(1)   The Holding in *In re Port Neches* Does Not Apply.**

According to the Colorado Plaintiffs, HIG exercised significant control over Wellpath through its employees on the Advantage Fund who sat on the Wellpath board.[67]   Under their view, the day-to-day control HIG employees exercised over Wellpath gave rise to an agency relationship whereby Wellpath acted as HIG's agent in carrying out the provision of medical care at the Colorado Detention Facilities.[68]   They imply this alleged control imposed a duty on HIG, and HIG breached that duty by implementing a cost-cutting initiative that reduced the quality of medical care at the Facilities.[69]   As a means of supporting the argument their claims are direct liability claims, the Colorado Plaintiffs argue the Delaware District Court's holding in *In re Port Neches* applies to the present case, where the court concluded plaintiffs could recover for negligent undertaking claims on a direct liability theory against an

---

out in *Bestfoods*, the court concluded the MDL plaintiffs' complaints failed to allege direct liability claims because "the factual allegations…do not indicate that [Sawgrass] operated [TPC's petrochemical facility], but that it operated the companies that operated the facility."  *Id.* (citing *Bestfoods*, 524 U.S. at 67–68).

[67] *See supra* note 15.

[68] *See supra* note 20.

[69] *See* ECF No. 318 at 15–16 (drawing analogy between allegations that HIG's control over Wellpath "led directly to the negligence and constitutionally deficient medical care that the three inmates suffered" and allegations that First Reserve's control over TPC imposed a separate duty of care to the MDL plaintiffs, who subsequently breached that duty, thereby subjecting them to direct liability).

equity sponsor.[70]   The Court, however, finds the present case distinguishable from *In re Port Neches*.

First, the factual allegations in the two cases are distinct. In *In re Port Neches*, the MDL plaintiffs claimed the equity sponsors were directly liable for negligent undertaking based on allegations the equity sponsors "demand[ed] that TPC increase production all the while crucialy denying [TPC] funds to adequately supply the plant with spare parts...or perform necessary maintenance needed to keep the plant safe." 660 B.R. at 193. More specifically, the MDL plaintiffs alleged the equity sponsors maintained control over "turnaround approval and authority in excess of $5,000,000," that the equity sponsors refused to authorize a turnaround necessary to "ameliorate the endemic viral infection of popcorn polymerization within the TPC Port Neches plant," and that "but for want of approval of a turnaround," "the explosions and subsequent plumes of toxic air which accompanied the same would not have occurred and [the MDL plaintiffs] would not have" been injured. *Id.* at 196. The Delaware District Court found these allegations were a sufficient basis upon which the MDL plaintiffs' direct liability negligent undertaking claims could rest. *Id.* at 193.

Here, the Colorado Plaintiffs claim HIG is directly liable for negligence and deliberate indifference based on allegations HIG controlled Wellpath's day-to-day operations through its members on the Advantage Fund, and through that control pursued a clear goal of cost-cutting that negatively affected the provision of medical care at the Colorado Detention Facilities, leading to harms suffered by the Colorado Plaintiffs. As HIG correctly points out, however, there are no allegations "HIG managed the provision of health care" at the Colorado Detention Facilities, nor are there allegations that "Wellpath was contractually authorized to act on HIG's behalf at any Facility."[71] Moreover, the Court finds the Colorado Amended Complaints contain no allegations regarding HIG's involvement in the specific conduct at issue which

---

[70] 660 B.R. at 193; ECF No. 318 at 14–16.
[71] ECF No. 66 at 25.

caused harms to the Colorado Plaintiffs.[72]  As discussed further below, this Court finds these factual allegations insufficient to support a theory of direct liability against HIG.

Moreover, the Texas Supreme Court in *In re First Reserve Management* found the same factual allegations made against the equity sponsors in *In re Port Neches* an insufficient basis to support a theory of direct liability for the MDL plaintiffs' negligent undertaking claims.  671 S.W.3d at 662–63.  Here, the Colorado Plaintiffs are attempting to impute direct liability on HIG by pleading factual allegations that are even more deficient in their attempt to invoke direct liability than the factual allegations in *In re First Reserve Management*.  Accordingly, this Court cannot find that portion of the *In re Port Neches* holding to apply to the current case.

Second, determining whether the Colorado Plaintiffs' claims are direct liability claims by asking whether those claims are property of the debtors' estate leapfrogs the procedural step necessary to answer that question in the first place.  Applying the *In re Port Neches* holding to the current case would effectively obviate the test clearly laid out by *Bestfoods* for analyzing the exact type of circumstances the Court is faced with today.  To determine whether the Colorado Amended Complaints assert claims based on direct liability, this Court is necessarily required to apply *Bestfoods*.

---

[72] Regarding the case of Carl Martin, there are no allegations HIG itself was involved in the decision-making and administration of care at the ACDF which left Mr. Martin's alcohol withdrawal untreated or inadequately treated, allegedly leading to him suffering injuries and ultimately death.  ECF No. 67-2, Ex. B-3 at 2–3.  Regarding the case of Dezaree Archuleta, there are no allegations HIG itself was involved in the decision at the CJC to remove Ms. Archuleta from suicide watch and the subsequent refusal to place her back on suicide watch which allegedly led to her death.  ECF No. 67-3, Ex. C-3 at 2–3.  Regarding the case of Stuart McLanely, there are no allegations HIG itself was involved in the decision at the CJC to deny Mr. McLanely his chronic myeloid leukemia medication, allegedly leading to him suffering harm and shortening his lifespan.  ECF No. 67-4, Ex. D-3 at 1–2.

> **(2)** **The Colorado Amended Complaints do not sufficiently allege HIG controlled the Colorado Detention Facilities as to give rise to a theory of direct liability.**

In order to plead causes of action based on direct liability, the Colorado Amended Complaints must allege facts indicating HIG operated the Colorado Detention Facilities through its own involvement in the specific activities of the Facilities that caused harm to the Colorado Plaintiffs. *Bestfoods*, 524 U.S. at 68. In the event the Colorado Amended Complaints merely allege HIG operated the Colorado Detention Facilities through its control of Wellpath, such allegations would only expose HIG to indirect liability. *Id.*

As outlined above, the Colorado Amended Complaints allege that HIG, through its employees sitting on the Advantage Fund and Board of Wellpath, engaged in extensive, day-to-day management of Wellpath, and that through this control, pursued a clear goal of cutting costs at Wellpath at the expense of quality of care for inmates at the Colorado Detention Facilities.[73] Much like the Texas Supreme Court's view of the factual allegations in *In re First Reserve Management*, the Colorado Plaintiffs' only factual bases to support a theory that HIG controlled Wellpath are that HIG "had an ownership interest" in Wellpath and designated three Advantage Fund board members (Mr. Kuritzsky, Mr. Reyna, and Mr. Wolfson) to manage the oversight of Wellpath. *Bestfoods* makes clear that dual ownership alone is not enough to support a theory of direct liability against a parent for the conduct its subsidiary. 524 U.S. at 69.

As noted above, the Colorado Plaintiffs make no allegations that "HIG managed the provision of health care" at the Colorado Detention Facilities, nor that "Wellpath was contractually authorized to act on HIG's behalf" at the Facilities.[74] Moreover, the Colorado Plaintiffs make

---

[73] *See supra* notes 15–19.

[74] *See generally* ECF No. 67-2, Ex. B-3; ECF No. 67-3, Ex. C-3; ECF No. 67-4, Ex. D-4; *see also* ECF No. 66 at 25.

no allegations that HIG was involved in the specific conduct at issue in the cases of Mr. Martin, Ms. Archuleta, and Mr. McLanely which allegedly caused them to suffer harm at the Colorado Detention Facilities.[75]   Rather, all factual allegations regarding the specific conduct leading to harm at the Colorado Detention Facilities were made against Wellpath.[76]   Accordingly, the Court finds the alleged oversight and control of HIG employees sitting on the Advantage Fund to be "consistent with [a] parent's investor status," and is not "eccentric under accepted norms of parental oversight of a subsidiary's facility."  *Id.* at 72.   Therefore, such allegations cannot serve as the basis for holding HIG direct liability for Wellpath's actions.

Regarding the alleged agency relationship that exposed HIG to direct liability,[77] rather than showing members of the Advantage Fund directed the specific actions of Wellpath at the Colorado Detention Facilities which brought about harms to inmates, the Colorado Amended Complaints merely allege HIG supervised Wellpath's financial and budgetary decisions.   Such allegations are insufficient to support a theory of direct liability against HIG based on an agency relationship.   *In re First Reserve Mgmt.*, 671 S.W.3d at 662; *Otto*

---

[75] *See supra* note 72 and accompanying text.

[76] *See id.* Regarding the case of Mr. Martin, his Amended Complaint alleges the specific conduct of Individual Medical Defendants (who were all employed by Wellpath) at the ACDF resulted in the inadequate provision of an alcohol withdrawal protocol that ultimately led to his death.  ECF No. 67-2, Ex. B-3 at 2–3.  Regarding the case of Ms. Archuleta, her Amended Complaint alleges the specific conduct of Wellpath employees Edward Keaveny and Michelle Wesolowski at the CJC resulted in her removal from suicide watch and the subsequent refusal to place her back on suicide watch, which ultimately led to her death.  ECF No. 67-3, Ex. C-3 at 2–3.  Regarding the case of Mr. McLanely, his Amended Complaint alleges the specific conduct of El Paso County sheriff's deputies and Wellpath employees at the CJC resulted in the denial and withholding of Mr. McLanely's chronic myeloid leukemia medication, leading to adverse effects on his life expectancy.  ECF No. 67-4, Ex. D-3 at 1–2.

[77] Referring to the Colorado Plaintiffs' allegations that "Wellpath undertook the provision of jail medical and mental health services, with the understanding that HIG was the principal in control of those activities"; that HIG "authorized and in fact required [Wellpath] to conduct those activities in a manner that prioritized containment of costs and jeopardized the lives of individuals with serious medical conditions."  ECF No. 318 at 6.

*Candies,* 2020 WL at *10; *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 271 (D. Del. 1989) (the "vital prerequisite to imposing liability based upon customary agency principles is finding a close connection between the relationship of the two corporations and the" underlying tort).

Regarding any alleged duty HIG owed to the Colorado Plaintiffs, nowhere are there allegations that HIG *itself* owed a duty of care at the Detention Facilities by virtue of its day-to-day control of Wellpath and its pursuit of cost-cutting initiatives. As above, whether HIG itself owed a duty to inmates based on its control of Wellpath's operations at the Facilities "cannot be predicated on" HIG's "supervision of its subsidiary's financial and budgetary decisions" alone. *In re First Reserve Mgmt.*, 671 S.W.3d at 663 (citing *Bestfoods*, 524 U.S. at 72). Therefore, taken as a whole, there are insufficient factual allegations to support a theory that the Colorado Plaintiffs can recover directly against HIG based on its oversight and control of Wellpath.

Aside from factual allegations, the Colorado Amended Complaints also do not contain legal theories against HIG *itself.* Rather, each cause of action for negligence and deliberate indifference plead that "HIG *and Wellpath*" or "Wellpath *and HIG*" engaged in conduct ultimately causing harm to inmates at the Colorado Detention Facilities. Again, *Bestfoods* makes clear that allegations a parent engaged in conduct at a facility through its subsidiary necessarily sounds in indirect liability, rather than direct liability. 524 U.S. 68; *In re First Reserve Mgmt.*, 671 S.W.3d at 663.

In sum, the Colorado Amended Complaints do not allege that HIG operated the Colorado Detention Facilities, but that HIG operated the company that operated the Facilities. Accordingly, the Court concludes the causes of action in the Colorado Amended Complaints for negligence and deliberate indifference against HIG are not based on theories direct liability. The causes of action are more accurately characterized as veil-piercing or derivative liability claims, as any potential liability HIG is exposed to derives from its control of and relationship to Wellpath.

## II. THE CLAIMS OF THE COLORADO PLAINTIFFS AND MR. FINCHAM ARE PROPERTY OF THE ESTATE AND THEREFORE WERE RELEASED UNDER THE RELEASE ORDERS.

With the understanding that both sets of complaints are based on theories of indirect liability, the Court moves on to the next part of its inquiry: determining whether those claims were property of the Debtors' Estates. Based on the analysis below, the Court concludes the claims of the Colorado Plaintiffs and Mr. Fincham fell within the Debtors' Estates at the time the Release Orders were signed. Accordingly, HIG was conclusively released from liability on account of those claims. Therefore, the Court is required to enjoin the Colorado Plaintiffs and Mr. Fincham from asserting their causes of action against HIG in the respective proceedings.

### A.

Under 11 U.S.C. § 541(a)(1), upon the filing of the bankruptcy petition, an estate is established that comprises "all legal or equitable interests of the debtor in property" including causes of action, "wherever located and by whomever held." *In re Emoral*, 740 F.3d at 879. Under 11 U.S.C. § 544(a) once a cause of action becomes the estate's property, the Bankruptcy Code gives the trustee the statutory authority to pursue it. Under 11 U.S.C. § 1107(a), a debtor in possession's rights are coextensive with that of a trustee. Therefore, whether a claim belongs to the estate determines who may bring that claim.

The United States Court of Appeals for the Third Circuit articulated the test for determining whether claims are property of the debtors' estate under 11 U.S.C. § 541(a)(1). Under the *Emoral* standard, a cause of action is considered property of the estate (i) "if the claim existed at the commencement of the filing and the debtor could have asserted the claim on his own behalf under state law," and (ii) the claim is a "general one, with no particularized injury arising from it." *Id.*; *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 200).

**B.**

**(1)** *Emoral* **prong one is satisfied because the claims existed before the commencement of the bankruptcy case, and Wellpath could have asserted the claims on its own behalf.**

It is largely undisputed that the conduct alleged in the Colorado Plaintiffs Amended Complaints and Mr. Fincham's complaint occurred prepetition.[78]   Therefore the key issue for prong one is determining whether Wellpath could have asserted those claims on its own behalf under state law.  The Court finds this hurdle easily overcome.  Courts in Delaware have routinely held that a subsidiary can self-pierce its own corporate veil to reach its parent.  *See Harrison v. Soroof Intern. Inc.*, 320 F.Supp.3d 602, 615–16 (D. Del. 2018) (collecting cases).  Courts have also held that under Delaware law, "debtors have standing to assert [indirect liability] claims outside of bankruptcy."  *In re Maxus Energy Corp.*, 571 B.R. 650, 658–59 (Bankr. D. Del. 2017).  Given the Court has already concluded both sets of complaints against HIG are based on theories of indirect liability (in particular, veil-piercing and derivative liability), the Court finds that Wellpath could have asserted those claims on its own behalf under Delaware state law.  *See Harrison*, 320 F.Supp.3d at 615–16.

To the extent the Colorado Plaintiffs dispute prong one of the *Emoral* standard, they suggest that because their claims are based on an independent duty HIG allegedly owed inmates at the Colorado Detention Facilities due to its control over Wellpath, any claims inmates had arising out of such conduct could only be asserted by the inmates, rather than Wellpath.  For the reasons outlined above, the Court has already rejected this characterization of the Colorado Amended Complaints.  The Colorado Plaintiffs have failed to state a sufficient factual bases for imposing a separate legal duty on the part of HIG for its control over Wellpath's conduct at the Colorado Detention Facilities.

---

[78] ECF No. 66 at 27; ECF No. 318 at 10.

Accordingly, any arguments Wellpath could not also have asserted the claims the Colorado Plaintiffs now assert are unfounded.

> **(2)** *Emoral* **prong two is satisfied because the claims are general claims based on theories of liability available to all creditors.**

The issue of whether *Emoral* prong two is satisfied "hinges on whether the claim[s are] 'general' to the estate or 'personal' to a specific creditor." *In re Wilton Armetale, Inc.*, 968 F.3d 273, 282 (3d Cir. 2020) (citing *In re Emoral*, 740 F.3d at 879).

A claim is general if it is "based on facts generally available to any creditor, and [for which] recovery would serve to increase the pool of assets available to all creditors." *See In re Whittaker Clark & Daniels, Inc.*, 152 F.4th 432, 448 (3d Cir. 2025) (citing *In re Emoral*, 740 F.3d at 881). "Contrast this with 'personal' claims, which are 'specific to the creditor' and in which 'other creditors generally have no interest.' *See id.* (citing *In re Emoral*, 740 F.3d at 879; *Foodtown*, 296 F.3d a 170). "A claim is 'personal' when the creditor's injury can be 'directly traced' to wrongful conduct committed by the defendant, whether that be the debtor or a third party." *See id.* (citing *In re Wilton Armetale*, 968 F.3d at 283; *In re Tronox, Inc.*, 855 F.3d 84, 107 (2d Cir. 2017)). "A claim is 'general' if the creditor's theory of liability depends on facts concerning the relationship between the defendant and another party—that is, 'facts generally available to any creditor.'" *See id.* (citing *In re Emoral*, 740 F.3d at 881).

At the same time, "the question of whether the claim is specific or general cannot turn on whether each plaintiff suffered its own particularized injury." *See In re TPC Grp.*, 2023 WL 2168045, at *6 (citing *In re Maxus*, 571 B.R. at 658). Rather, the court must focus on the "specific theory [of liability]" upon which the claims are based, rather than the "underlying injury giving rise to the claims." *In re Maxus*, 571 B.R. at 660.

At first glance the Colorado Plaintiffs' proffered theory of liability seems to fit the bill for personal claims under *Emoral*. According to the Colorado Plaintiffs, the claims they assert would not stand to benefit all creditors because the harms were directly caused by HIG and individually suffered by each respective Plaintiff.[79] They argue the only creditors who have an interest in those claims are the Colorado Plaintiffs, and therefore those claims are personal claims falling outside the Debtors' Estates.[80]

At second glance one realizes the Colorado Plaintiffs' claims must be considered general claims. The Court first recognizes that the particularized nature of the Colorado Plaintiffs' injuries is not determinative as to whether their claims are general. *In re Maxus*, 571 B.R. at 660. Next the Court analyzes the factual allegations in the Colorado Amended Complaints. As above, the Court did not find a single fact alleging HIG itself operated the Colorado Detention Facilities. Rather, it is alleged that HIG through its oversight and control of Wellpath operated the Facilities. This distinction is key, because it reveals the factual allegations cannot serve as a basis for direct liability against HIG. Rather, any claims predicated on those factual allegations would be derivative of HIG's ownership and control of its subsidiary, Wellpath. A claim that HIG is derivatively liable by virtue of its relationship with Wellpath and should therefore be charged with its liabilities "would benefit all creditors" of Wellpath generally. *See In re Tronox*, 855 F.3d at 107 (citing *In re Emoral*, 740 F.3d at 880). While "the facts necessary to prove that" *Wellpath* committed the underlying torts of negligence and deliberate indifference "may be particular" to the Colorado Plaintiffs, "the facts necessary to impute that liability to" *HIG* "would be…generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors." *See id.* (citing *In re Emoral*, 740 F.3d at 881). Accordingly, the factual allegations only support general claims.

---

[79] ECF No. 318 at 11.

[80] *Id.*

Regarding legal theories, again the Colorado Plaintiffs predicated their argument that their claims against HIG are direct claims based on the implication that HIG owed inmates at the Colorado Detention Facilities an independent duty based on HIG's control of Wellpath. As stated above, the Court has rejected this argument, finding no legal theories in the Colorado Amended Complaints that purport to hold HIG directly and independently liable for its alleged conduct. It is not enough that the Colorado Plaintiffs allege a cause of action that in theory claims HIG owed them an independent duty of care. *Emoral* and subsequent cases make clear that "whether a claim asserted by a creditor properly belongs to the bankruptcy estate is driven by the 'theory of liability,' *not the cause of action*." *See In re Port Neches*, 660 B.R. at 177 (emphasis added). The Court has concluded that any legal theories asserted against HIG are for claims based on indirect liability. Accordingly, "no claim for veil piercing" that the Colorado Plaintiffs "may assert has anything to do with" any of the Colorado Plaintiffs "direct interactions with" HIG or any of its employees sitting on the Advantage Fund. *In re TPC Grp.*, 2023 WL 2168045 at *7. "Rather, to the extent there is a basis for" the Colorado Plaintiffs to pierce HIG's corporate veil, "such a theory would also be available to any other creditor." *Id.* Therefore, the Colorado Plaintiffs' claims are properly considered general, rather than personal claims.

Mr. Fincham's case proves slightly easier. As with the Colorado Plaintiffs' complaints, Mr. Fincham did not plead a single factual allegation as to suggest that HIG is directly liable for harms that occurred at the North Carolina Detention Facility. The Court has already concluded Mr. Fincham's claims were expressly pleaded as alter-ego, indirect liability claims. As above, an alter-ego, indirect liability claim is necessarily premised on HIG being derivatively liable for its relationship with Wellpath. Therefore, Mr. Fincham's claims stand to benefit all creditors. *In re TPC Grp.*, 2023 WL at *7. Moreover, to the extent there is a basis for Mr. Fincham to pierce HIG's corporate veil, "such a theory would also be available to any other creditor." *Id.* Therefore, Mr. Fincham's claims are general claims.

Accordingly, because both prongs of the *Emoral* standard are satisfied, the Court concludes the causes of action in the Colorado Amended Complaints and Mr. Fincham's complaint were property of the Debtors' Estates at the time of entry of the Release Orders. Because those claims are indirect liability claims that fell within the Estates, those claims were conclusively released under the Release Orders. Therefore, the Court must enforce the Plan and enjoin the Colorado Plaintiffs and Mr. Fincham from proceeding on account of those claims.

## CONCLUSION[81]

Based on the foregoing reasons, the Motion to Enforce Confirmation and Release Orders is GRANTED.

HIG should settle two orders within 14 days from the entry of this Opinion, (i) the first a form of order on these particular matters and (ii) the second, a formal process to resolve future attempts to litigate the releases. Any objections to the proposed forms of order will be due 14 days thereafter. The Court will conduct a hearing on the proposed forms of order and any objections on December 11, 2025, at 11:45 a.m. by telephone and video conference.

SIGNED 11/12/2025

Alfredo R Pérez
United States Bankruptcy Judge

---

[81] This Order constitutes the findings of fact and conclusions of law required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.